IT IS FURTHER ORDERED that certificate of probable cause shall not issue herein.

IT IS FINALLY ORDERED that execution of sentence is further stayed for an additional ten (10) days, to and including March 11, 1993, in order to provide petitioner an opportunity to appeal this Court's denial of a certificate of probable cause to the Court of Appeals. In the event such appeal is not sought, then the stay shall expire on March 11, 1993. If notice of appeal is filed on or before March 11, 1993, the stay of execution of the sentence shall be determined by fur-

ther order of the United States Court of Appeals for the Eighth Circuit.

UNITED STATES of America, Plaintiff,

v.

Raymond D. CHEELY, Jr., Douglas P. Gustafson, and Peggy Gustafson Barnett, Defendants.

No. A92–073 Crim.

United States District Court, D. Alaska.

Nov. 16, 1992.

1433

Wevley Wm. Shea, U.S. Atty., Mark H. Bonner, Dept. of Justice, Joseph W. Bottini, Crandon H. Randell, Asst. U.S. Attys., Anchorage, AK, for U.S.

Nancy Shaw, Federal Public Defender, Anchorage, AK, for Raymond D. Cheely, Jr.

Carmen L. Gutierrez, Anchorage, AK, for Douglas P. Gustafson.

Phillip Paul Weidner, Law Offices of Phillip Paul Weidner & Associates, Inc., Anchorage, AK, for Peggy Gustafson–Barnett.

## ORDER

SINGLETON, District Judge.

Raymond D. Cheely, Jr. ("Cheely"), Douglas P. Gustafson ("Douglas") and Peggy Gustafson–Barnett ("Peggy") were jointly charged in a multi-count indictment. In substance, the government alleges that the defendants conspired to mail an explosive device, mailed the device, and thereby accomplished the death of its recipient. Cheely, Douglas and Peggy join in a number of pretrial motions, and in addition, each has separately filed motions on his/her own. All pretrial motions were initially assigned to a Magistrate Judge, who read the parties' briefs, held evidentiary hearings, heard oral argument and rendered reports and recommendations. Various parties have tendered objections to those recommendations, and the matters are before me for decision. Motions to change venue have been granted, and Judge Fitzgerald will be trying Cheely and

Douglas. Peggy's case has been reassigned to Chief Judge Manuel L. Real of the Central District of California. Trial is scheduled to begin before Chief Judge Real in Los Angeles on Tuesday, December 1, 1992. I will therefore be careful to set forth my conclusions in full. I do this because anything I decide will become the law of this case, and I do not wish the parties or a successor judge to be unclear regarding what was decided. *See Richardson v. United States*, 841 F.2d 993, 996 (9th Cir.1988), amended, 860 F.2d 357 (discussing the doctrine of the law of the case in the Ninth Circuit).

## SUBJECT MATTER JURISDICTION

Before addressing the motions, it is necessary to consider the government's claim that this court lacks subject matter jurisdiction over Cheely and Douglas. *See, e.g.,* government's memorandum at Docket No. 324 at 2 n. 1. The government has appealed this court's determination that the statutes under which Cheely and Douglas are being prosecuted would not permit the imposition of the death penalty without violating the United States Constitution. *See Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), *reh'g denied*, 409 U.S. 902, 93 S.Ct. 89, 90, 34 L.Ed.2d 163, 164. The effect of this court's order was to prevent the government from submitting the issue of capital punishment to the jury and to give notice that it would not instruct on capital punishment. The order was thus an order *in limine*.

■ Generally, when an appeal is taken from a final judgment in a federal civil case, and by reasonable extension in a criminal case, jurisdiction over the case is transferred to the appellate court and the trial court loses jurisdiction over the case. *See Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56, 58, 103 S.Ct. 400, 402, 74 L.Ed.2d 225 (1982). A final judgment is one that disposes of all the issues in a case and brings it to an end. All other orders are interlocutory. *See Abney v. United States*, 431 U.S. 651, 97 S.Ct. 2034, 52 L.Ed.2d 651 (1977). Nevertheless, the Supreme Court has granted finality for purposes of appeal to certain orders which it deems to be collateral orders,

when it finds that such orders are separate and distinct from the merits of the case and, unless reviewed prior to a final judgment, will deprive a litigant of basic rights. *Abney*, 431 U.S. at 657, 97 S.Ct. at 2039; *see Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 545–46, 69 S.Ct. 1221, 1225–26, 93 L.Ed. 1528 (1949).

■ Where a party appeals a collateral order, the trial court only loses jurisdiction if a stay is granted. *Britton v. Co-op Banking Group*, 916 F.2d 1405, 1411–12 (9th Cir.1990). Where a party appeals an interlocutory order, the trial court only loses jurisdiction as to the precise issue appealed. *Id.* at 1412. This circuit has applied these general rules to government appeals in criminal cases. *See United States v. Gatto*, 763 F.2d 1040, 1049–50 (9th Cir.1985); *accord, United States v. White*, 846 F.2d 678, 693 n. 23 (11th Cir.1988), *cert. denied*, 488 U.S. 984, 109 S.Ct. 537, 538, 102 L.Ed.2d 568. In this case, the precise issue appealed is whether Cheely and Douglas can be executed under existing laws if convicted. This court has no jurisdiction to modify its earlier decision regarding this issue, since to do so would present the appellate court with a "moving target." *Britton*, 916 F.2d at 1411–12, citing *McClatchy Newspapers v. Central Valley Typo. Union No. 46*, 686 F.2d 731 (9th Cir. 1982), *cert. denied*, 459 U.S. 1071, 103 S.Ct. 491, 74 L.Ed.2d 633 (trial court may not reverse own order while that order is on appeal, even if convinced earlier order was erroneous). In all other respects, this court has jurisdiction to proceed to trial despite the appeal unless a stay is ordered.

This court never found, and the parties never cited, a specific rule or case decision governing standards for determining when to stay trial in a criminal case while the government prosecutes an appeal. The court therefore applied the general rules governing stays on appeal set forth in *Hilton v. Braunskill*, 481 U.S. 770, 776–78, 107 S.Ct. 2113, 2119–20, 95 L.Ed.2d 724 (1987); *Artukovic v. Rison*, 784 F.2d 1354, 1355 (9th Cir.1986). I determined that the government was not likely to prevail on appeal, and that although significant issues were raised, a balancing of hardships and consideration of

the public interest militated against a stay of trial. *Artukovic*, 784 F.2d at 1355. I therefore denied the stay and scheduled the case for trial. The government sought a writ of prohibition in the appellate court, which that court treated as a renewal of the motion for a stay. Applying the same standards but exercising its independent judgment, the three member panel hearing the case denied the stay and directed that the case proceed to trial in an unpublished memorandum order. *United States v. Cheely, et al.*, No. 92–30257 Order (September 3, 1992).

This court therefore has jurisdiction over this case, over the trial and over any pretrial motions, except that it lacks jurisdiction to change its decision regarding the death penalty. Because the Ninth Circuit has independently considered the criteria governing stays and denied a stay, that decision is probably binding on this court under the doctrine of the law of the case, and on this record could not be modified. *See Richardson*, 841 F.2d at 996. Even if I did have the power to reconsider my order denying a stay, I find nothing in the current record which would persuade me to do so.[1]

---

1. The government argues that its appeal of an interlocutory or collateral order divests this court of jurisdiction unless the appeal is frivolous. That is not the standard in this circuit. *See United States v. Gatto*, 763 F.2d 1040, 1049–50 (9th Cir.1985). A non-frivolous appeal of an interlocutory order does not require a stay unless the criteria set out in *Hilton v. Braunskill*, 481 U.S. 770, 776, 107 S.Ct. 2113, 2119, 95 L.Ed.2d 724 (1987), are met. Both this court and the Ninth Circuit have concluded that a stay is inappropriate in this case.

 I should point out that I am not certain what basis the government asserts for appellate jurisdiction over its appeal. The order appealed is not final under 28 U.S.C. § 1291, and it is so intermixed with the merits that it would not qualify as a collateral order under *Abney v. United States*, 431 U.S. 651, 97 S.Ct. 2034, 52 L.Ed.2d 651 (1977). It is instructive to note that the government has never argued either here or, apparently, in the appellate court that the collateral order doctrine applies. I have therefore assumed that the government is relying on 18 U.S.C. § 3731, which would make it an interlocutory appeal governed by *Gatto*. It doesn't matter, however, how the order is characterized, since even if the order appealed qualifies as a collateral order this court retains jurisdiction in the absence of a stay. *Britton v. Co-op Banking Group*, 916 F.2d 1405, 1412 (9th Cir.1990).

# CRIMINAL MOTION PRACTICE IN THE DISTRICT OF ALASKA

All three defendants have requested that an evidentiary hearing be granted *de novo*. *See* Docket Nos. 581 and 582. Therefore, I will begin by discussing the rules governing motion practice in criminal cases in the District of Alaska. Federal Rule of Criminal Procedure 47 gives trial judges substantial discretion in adopting procedures governing motion practice. In this district, the court has exercised its discretion in favor of very formal procedures. *See* Local Criminal Rule 10, which incorporates by reference the Local General Rules "where applicable," i.e., where no specific criminal rule governs; and Local General Rule 5, which generally governs motion practice.[2] The rule requires "a clear, concise, complete and candid written statement of the reasons in support thereof [and in opposition thereto]," Rule 5(B)(1)(b) and Rule 5(B)(2)(b). How thoroughly a lawyer must support a motion depends on which of her contentions of fact and law will be disputed. If there will be no dispute and her opponent is merely being dilatory, a brief explanation will suffice. A lawyer should

---

2. Any motion practice must provide "due process," which, in context, means notice and a reasonable opportunity to be heard. *See Weidner v. Superior Court, Third Judicial Dist.*, 715 P.2d 264, 268 (Alaska App.1986) (Singleton, J.) (in which I discuss motion practice in criminal cases and note the importance of communicating to counsel in advance the rules that will apply). Many courts, state and federal, try to cut down on paperwork by utilizing an "omnibus hearing" as a screening device to encourage counsel to raise criminal motions without prior notice because the "issues are usually sufficiently typical as to be capable of oral presentation and on-the-spot disposition. Where an evidentiary hearing or formal matter is needed, the hearing can be continued as a matter of course for such purposes." *Weidner*, 715 P.2d at 267, quoting ABA Standards Relating to Discovery and Procedure Before Trial § 5.3, commentary at 118 Approved Draft 1970). In the District of Alaska, we have opted for a more formal procedure which concentrates on written, as opposed to oral, submissions. The parties are given advance notice of this by the applicable local rules and were reminded of those rules in an earlier order I issued prior to the hearings before the magistrate. *See* Docket No. 481.

never make a motion unless she has first consulted her opponent and sought an informal agreement. Where it is clear that no agreement can be reached, and that the facts will be disputed and the law debated, more formal procedures must be followed. In practice, this requires the parties to put all of the historical facts[3] upon which they rely in writing so that the court can review the matter and determine whether oral argument or an evidentiary hearing is warranted. Whether to hear oral argument is discretionary with the trial court. Local General Rule 5(C)(1).[4] Whether to hold an evidentiary hearing is also a matter of discretion with the trial court. *Center Art Galleries–Hawaii, Inc. v. United States,* 875 F.2d 747, 754 (9th Cir.1989). Generally, an evidentiary hearing is only required if the papers submitted in support of and in opposition to the motion are sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that there are contested issues of fact going to the validity of the search or to the resolution of other issues necessary to decide the motion. *Center,* 875 F.2d at 754; *United States v. Batiste,* 868 F.2d 1089, 1091 (9th Cir.1989). As one court stated, evidentiary hearings need only be held when, "the allegations in the moving papers, including affidavits if any are filed, are sufficiently definite, specific, detailed, and nonconjectural, to enable the court to conclude that a substantial claim is presented." *Cohen v. United States,* 378 F.2d 751, 760–61 (9th Cir.1967), *cert. denied,* 389 U.S. 897, 88 S.Ct. 217, 19 L.Ed.2d 215.[5] If the affidavits and

---

3. Historical facts would be those that satisfy the five W's and the one H relied upon by journalists: Who, What, Why, Where, When and How. *Cf. United States v. McConney,* 728 F.2d 1195, 1200 (9th Cir.1984), *cert. denied,* 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (identifying "historical facts").

4. Oral argument on issues of law is not a due process right. *Price v. Johnston,* 334 U.S. 266, 286, 68 S.Ct. 1049, 1060, 92 L.Ed. 1356 (1948); *Burchett v. Cardwell,* 493 F.2d 492, 494–95 (9th Cir.1974), *cert. denied,* 419 U.S. 874, 95 S.Ct. 136, 42 L.Ed.2d 114.

Local Rule 5(C) permits parties to request oral argument on any motion but provides: "However, the Court, to expedite its business, may order the submission and determination of motions without oral hearing." This rule is in *para materia* with Federal Rule of Appellate Procedure 34, which governs oral argument on appeal. In the case of dispositive motions, and by extension suppression motions in criminal cases, Local Rule 5 might be interpreted in conformity with the appellate rule to allow oral argument unless: (1) The motion or response is frivolous; (2) the dispositive issue or set of issues has been recently and authoritatively decided; or (3) the facts and legal arguments are adequately presented in the briefs and record and the decisional process would not be significantly aided by oral argument. At one time, the Ninth Circuit condemned a local rule that prevented parties from requesting oral argument on dispositive motions, *see Dredge Corp. v. Penny,* 338 F.2d 456, 462 (9th Cir.1964). Our local rule always permits a party to request oral argument on any motion. There is dicta in *Dredge* that might make oral argument a matter of right regardless of the state of the record or the quality of the briefing, but that view has not prevailed. *See Lake at Las Vegas Investors Group, Inc. v. Pacific Malibu Develop-*

*ment Corp.,* 933 F.2d 724, 728 (9th Cir.1991), *cert. denied,* — U.S. —, 112 S.Ct. 1295, 117 L.Ed.2d 518 (1992). *Lake* stands for the proposition that oral argument may be dispensed with in connection with dispositive motions where the issues are fully presented in the written submissions. The Ninth Circuit position on the right to oral argument at the trial level would appear to parallel the right to oral argument on appeal. *See also Fernhoff v. Tahoe Regional Planning Agency,* 803 F.2d 979 (9th Cir.1986) (no prejudice in denying oral argument where issues are clear from briefs and record); *Houston v. Bryan,* 725 F.2d 516, 517 (9th Cir.1984) (same). There is no reason to treat requests for oral argument on suppression motions in criminal cases differently than oral argument on motions for summary judgment when only issues of law are involved. Where there are disputed issues of material fact, the question of oral argument blends into the question of allowing an evidentiary hearing. If an evidentiary hearing is held, then oral argument will be heard as well; although the court might not allow reargument if argument and hearing were heard by a magistrate judge.

5. It is important to recognize that a dispute about the facts must satisfy three tests before an evidentiary hearing is required. First, it must involve historical facts, *see* n. 3, *supra,* and not legal conclusions, speculation or conjecture. Second, it must be based on evidence derived from witnesses with first hand knowledge of the facts prepared to testify under oath if an evidentiary hearing is held. (However, the parties may rely on reasonable inferences from the direct evidence in support of and in opposition to a claim, i.e. circumstantial evidence. *See Branch v. Tunnell,* 937 F.2d 1382, 1387–88 (9th Cir. 1991) (discussing use of circumstantial evidence in analogous situation). Under the Local Rules it must be presented by affidavit, transcript, etc.

other evidence submitted by the opposing parties show as a matter of law that the defendant is or is not entitled to relief, no evidentiary hearing is required. *United States v. Irwin*, 612 F.2d 1182, 1187 (9th Cir.1980). The rules governing motion practice in general thus parallel the rules governing entitlement to an evidentiary hearing to determine the integrity of an affidavit in support of a search warrant under *Franks v. Delaware*, 438 U.S. 154, 171–73, 98 S.Ct. 2674, 2684–85, 57 L.Ed.2d 667 (1978).[6] In *Franks*, the court stressed that a motion must be supported by reliable evidence, or the absence of reliable evidence must be explained. A desire to cross-examine government witnesses is not a sufficient explanation. *Id.* at 171, 98 S.Ct. at 2684. Decisions of the Ninth Circuit make it clear that other explanations are also insufficient, including: 1) Fear of self-incrimination, because evidence at a suppression hearing cannot be used against the defendant; and 2) the lack of complete information, given limitations on discovery in criminal cases. *See Batiste*, 868 F.2d at 1092. Of course, even in the absence of disputed issues of material fact, the judge, and by extension the magistrate judge, may hold an evidentiary hearing, but he is to be discouraged from doing so. *See Batiste*, 868 F.2d at 1092–93.

If there are disputed issues of material fact, the district court must make explicit findings on the material or essential facts. Federal Rule of Criminal Procedure 12(e); *United States v. Prieto–Villa*, 910 F.2d 601 (9th Cir.1990).[7] If an evidentiary hearing is held, the Federal Rules of Evidence apply. *United States v. Brewer*, 947 F.2d 404, 410 (9th Cir.1991). Where, as here, motions were initially referred to a magistrate judge, the court must exercise its independent judgment, and if the magistrate's conclusions are challenged, the court must decide the matter *de novo*. *See United States v. Remsing*, 874 F.2d 614 (9th Cir. 1989). *De novo* review does not mean that the court must hold a new hearing to evaluate credibility disputes, *see United States v. Raddatz*, 447 U.S. 667, 676, 100 S.Ct. 2406, 2412, 65 L.Ed.2d 424 (1980), *reh'g denied*, 448 U.S. 916, 101 S.Ct. 36, 65 L.Ed.2d 1179, or grant further argument, *United States v. Koenig*, 912 F.2d 1190, 1192 (9th Cir.1990). However, the court should not defer to the magistrate's factual findings. *Koenig*, 912 F.2d at 1192. If an evidentiary hearing is found necessary, the court must either listen

---

*See* Federal Rule of Civil Procedure 56(e) (establishing a similar procedure for proving facts in conjunction with dispositive motions in civil cases)). Finally, the disputed facts must be material, i.e. essential. A fact or group of facts is material if, and only if, resolving them in the moving party's favor will require a decision in her favor as a matter of law.

6. "To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations *must be accompanied by an offer of proof*. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. *Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained.* Allegations of negligence or innocent mistake are insufficient. *Franks v. Delaware*, 438 U.S. 154, 171, 98 S.Ct. 2674, 2684, 57 L.Ed.2d 667 (1978) (emphasis added). The same showing adapted to the issue in dispute must be made regarding any motion to suppress under the Local Rules of this court.

7. What facts are essential or material will of course depend on the nature of the dispute between the parties. In *Prieto–Villa*, 910 F.2d 601, the court was concerned that the contested search and seizure occurred in the context of a warrantless stop or seizure and that no facts were found by the trial court resolving disputes debated on appeal. Under our practice, Prieto–Villa would have been required to support his suppression motion with a detailed affidavit setting out his version of the historical facts surrounding his seizure and a detailed memorandum of law setting out the specific facts which in his view warranted a finding of an illegal stop or arrest and the specific cases applying circuit law to those facts establishing his right to prevail. The government would then be required to respond with equally detailed affidavits and an equally fact specific memorandum of law addressing Prieto–Villa's concerns. At this juncture, the motions judge could review the respective submissions and determine whether an evidentiary hearing was necessary to decide the disputes or whether the matter could be resolved on the existing record. The problem in *Prieto–Villa* was no doubt aggravated by the fact that in the trial court, the parties' attention was never focused on the resolution of specific factual disputes.

to the recorded testimony or procure and read a transcript. *Remsing,* 874 F.2d at 618. Just as the court may not defer to the magistrate judge's findings of fact, it also need not defer to the magistrate judge's decision to grant oral argument or hold an evidentiary hearing, if the court concludes that neither are necessary. The parties were given advance notice that they would have to comply with Local Rule 5 and that I would not be bound by Judge Branson's decisions regarding evidentiary hearings and oral argument. *See* Order at Docket No. 481. Defendants' motions for a *de novo* evidentiary hearing at Docket Nos. 581 and 582 are DENIED.

## MOTION TO SET ORDER OF TRIALS

■ Cheely, Douglas and Peggy are charged in a single indictment, but the trial of Peggy was severed from the trials of Cheely and Douglas to avoid problems under *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). The government has moved for an order permitting it to try Peggy first and then proceed to trial against Cheely and Douglas. *See* Docket No. 387. The government believes that it has a strong case against Peggy, and that if she is convicted, her testimony against Cheely and Douglas can be compelled. It is not argued that both cases can be tried at once. All three defendants argue that Cheely and Douglas should be tried first. Peggy argues that she has had insufficient time to prepare an insanity defense. She indicates that she would rather be held in contempt of court than testify against her brother regardless of the outcome of her trial. Cheely and Douglas argue that they are ready to go to trial and any delay would impact their speedy trial rights.

The court recognizes that the government wishes to delay the trial of Douglas and Cheely in the hope that the Ninth Circuit will reverse this court's ruling regarding the availability of the death penalty. Both parties realize that once jeopardy attaches at the trial of Douglas and Cheely, the appeal will as far as they are concerned be moot, though the Ninth Circuit might go on to decide the case to provide guidance on this issue in the future. Cheely and Douglas hope to mini-

mize the risk of capital punishment by having their trial first. I have not considered either party's wishes regarding capital punishment to be significant in deciding this issue.

Judge Fitzgerald had continued the trial in this case while he considered the defendants' motion to change venue. I assume that the additional time permitted the parties to prepare any insanity defense Peggy may have. Magistrate Judge Branson has allowed Peggy funds for a psychological evaluation and ruled on Peggy's objections to being interviewed by the government's psychiatrist. I will rule on those issues to the extent they are before me in a separate order, but my ruling will not affect the proper order of trials since she will have an adequate opportunity to prepare regardless of what decision I reach. I have not therefore considered Peggy's claim that she is not prepared in deciding the issue of the proper order of trial.

I assume I have discretion to determine the order of trial when defendants are severed pursuant to Fed.R.Crim.P. 14. I think there are good reasons to have Peggy tried first. Even though the cases are being sent outside the district, *see* Docket No. 644, it seems reasonable to me to allow the government the opportunity to try and obtain Peggy's testimony without going through the complicated procedure set forth in *Kastigar v. United States,* 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972), *reh'g denied,* 408 U.S. 931, 92 S.Ct. 2478, 33 L.Ed.2d 345. Trying Peggy first would not seem to violate any right she might have (*see In re Grand Jury Proceedings,* 889 F.2d 220, 222 (9th Cir.1989) (convicted person may be compelled to testify under a grant of use immunity even though her conviction is on appeal), or deprive Cheely and Douglas of any right they might have. *Cf. United States v. Pimentel,* 654 F.2d 538, 545 (9th Cir.1981) (apparently assuming that it is discretionary with the prosecutor which charges are first tried and finding no prejudice from the prosecutor's choice); *United States v. Rubin,* 609 F.2d 51, 65 (2d Cir. 1979), *aff'd,* 449 U.S. 424, 101 S.Ct. 698, 66 L.Ed.2d 633 (1981) (judge authorized prosecutor to try one defendant first under similar circumstances). In the exercise of my dis-

cretion, I accept Magistrate Judge Branson's recommendation at Docket No. 444 and direct that Peggy proceed to trial first and that the trial of Cheely and Douglas follow. The government's motion at Docket No. 387 is GRANTED.

### Title III Claims.

A. *Interception of telephone calls between a prison inmate and his sister outside the institution.*

All three defendants contend that the interception of telephone calls between Douglas and his sister, Peggy, by state officials while Douglas was incarcerated at a state penal institution violated Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–20 (hereinafter "§ 2510") (Docket Nos. 310 & 381). *See* Docket Nos. 310 and 381. Magistrate Judge Branson held an evidentiary hearing on this claim, and I have obtained and reviewed a transcript of that hearing. I conclude, however, that the essential facts are few and undisputed and that therefore, no evidentiary hearing was necessary. The disputes between the parties involve questions of law, not questions of fact.

The essential facts are as follows: In September of 1991, Douglas was transferred to Spring Creek Correctional Facility to serve a sentence for conviction of a state offense. Peggy is Douglas' sister and is not a lawyer. She knew Douglas was serving a sentence at Spring Creek. When Peggy talked to Douglas on the telephone, their conversations were recorded by prison officials. Such recording was routine and was not aimed at Douglas personally. In fact, it was part of a policy established in November of 1990, long before Douglas arrived at the institution, to ensure the security and orderly management of Spring Creek. Clearly visible signs posted near each telephone, and a warning in the prisoner handbook furnished to each prisoner, disclosed that inmate telephone calls to anyone other than a lawyer were subject to monitoring. Prior to the incidents which gave rise to the offenses charged in the indictment, inmates were not explicitly told that their telephone conversations might be recorded. They were not explicitly told that all non-attorney inmate telephone calls were recorded on a twenty-four hour basis and could be reviewed at any time by a correctional officer.[1]

At the outset, it is important to recognize that interception of inmate telephone conversations does not violate the Fourth Amendment rights of the inmate or of the non-inmate with whom he converses, at least where, as here, the non-inmate knows she is conversing with an inmate in a prison. *Bell v. Wolfish,* 441 U.S. 520, 546, 555–57, 99 S.Ct. 1861, 1877, 1882–84, 60 L.Ed.2d 447 (1979). *Lanza v. New York,* 370 U.S. 139, 143–44, 82 S.Ct. 1218, 1220–21, 8 L.Ed.2d 384 (1962); *United States v. Willoughby,* 860 F.2d 15, 21–22 (2d Cir.1988), *cert. denied,* 488 U.S. 1033, 109 S.Ct. 846, 102 L.Ed.2d 978 (1989). *But see Franklin v. Oregon,* 662 F.2d 1337, 1347 (9th Cir.1981) (recognizing that a prison inmate may have some slight constitutional privacy protection under the Fourth Amendment).

The issues in this case turn instead on the interpretation of terms in a federal statute. In a statutory construction case, the beginning point must be the language of the statute, and when a statute addresses an issue clearly, judicial inquiry into the statute's meaning, in all but the most extraordinary circumstances, ceases. *Estate of Cowart v. Nicklos Drilling Co.,* —— U.S. ——, ——, 112 S.Ct. 2589, 2594, 120 L.Ed.2d 379 (1992), *cert. denied,* —— U.S. ——, 112 S.Ct. 3026, 120 L.Ed.2d 897. *United States v. Kahn,* 415 U.S. 143, 151, 94 S.Ct. 977, 982, 39 L.Ed.2d 225 (1974) (addressing Title III). I am satisfied that Congress has spoken with clarity regarding the dispositive issues in this case.

Cheely and the others seek suppression based upon § 2515, which bars use in evidence of "intercepted wire communications" if the interception was in violation of Title III. To determine which interceptions require suppression under this section we must look to § 2518(10)(a), *see United States v. Donovan,* 429 U.S. 413, 432–40, 97 S.Ct. 658, 670–74, 50 L.Ed.2d 652 (1977). There are three bases for suppression: 1) The communication was unlawfully intercepted; 2) the order of authorization or approval under

which it was intercepted is insufficient on its face; or 3) the interception was not made in conformity with the order of authorization or approval. *Id.* at 432, 97 S.Ct. at 670.

In seeking suppression of the prison interceptions, Cheely and the others rely on the first ground stated above. In seeking suppression of subsequent interceptions authorized by a warrant, Cheely and the others rely upon the next two grounds. I will address the prison interceptions in this section of this order and the interceptions by warrant in the next section.

To decide the first issue we must consider two statutes. Section 2511 prohibits interception of wire communications. Section 2510(4) defines "intercept" to mean listening to any wire communication by means of "any electronic, mechanical, or other device." Section 2510(5)(a)(ii), which is dispositive of this case, defines "electronic, mechanical, or other device" to exclude "any telephone.... or any other thereof.... being used.... by an investigative or law enforcement officer in the ordinary course of his duties."

It is undisputed that a telephone is a form of wire communication, and it is clear that prison officials are law enforcement officers [8] and that the recordings in issue were made by the prison officials. The phrase to be interpreted occurs in § 2510, the plain meaning of which resolves all of the issues presented by the motion to suppress.

Title III forbids the willful interception of wire communications, including telephone conversations, without prior judicial authorization. Although the parties have not cited any Ninth Circuit authority, other circuits uniformly hold that the act applies to prison monitoring of inmate calls. *See, e.g., United States v. Amen,* 831 F.2d 373, 378 (2d Cir.1987), *cert. denied,* 485 U.S. 1021, 108 S.Ct. 1573, 99 L.Ed.2d 889 (1988). Although there are numerous cases discussing routine prison monitoring, none find a violation of Title III when the monitoring does not involve a conversation between an inmate and her lawyer. The cases rely on two Title III exceptions. Section 2510(5)(a)(ii), read in context, permits ·interception of inmate tele-

8. A law enforcement officer is defined under § 2510(7) to include "any officer ... of a state or political subdivision thereof who is empowered by law to conduct investigations of or to make arrests for offenses enumerated in this chapter...." The relevant enumeration would appear to be in § 2516(2), which seems to include any state felony, i.e., offense with a potential punishment of more than one year. I agree with the defendants that these two sections when read together do incorporate state law by reference. Defendants argue that state prison guards do not have the authority to make arrests for felonies. The decided cases only require that the arrest or investigation authority extend to inmates. It is not necessary that a prison guard have the authority to arrest or investigate someone outside the prison. It is important to note that the definition is in the disjunctive: A person need not have the power to arrest if he has the power to investigate. The government only addresses this matter in passing, referencing AS 11.81.-900(b)(38) [now AS 11.81.900(b)(39)], which defines a peace officer as any public servant vested by law with the authority to make arrests or maintain public order. This argument begs the question, which is: Are prison officials authorized by law to investigate felonies or make arrests for felonies? AS 01.10.060(7)(E) more closely addresses this issue. It defines peace officer to include "an officer whose duty it is to enforce and preserve the public peace." *See also* AS 12.25.010 *et seq.* which discusses who can make an arrest under state law. Alaska law allows anyone to make an arrest for a felony. AS 12.25.030. Peace officers are simply given additional authority to arrest persons for committing misdemeanors and to make arrests pursuant to a warrant. I find no indication in the applicable statutes that prison officials have any express power to arrest beyond those of a private person. On the other hand, the Commissioner of Corrections has the authority to maintain and control correctional facilities and establish programs for prisoners which will protect the public, *see* AS 33.30.011, and it is the Commissioner who is responsible for monitoring, *see* AS 33.30.-231. In performing his functions, it would therefore appear that the Commissioner would necessarily have the implicit power to investigate felonies incurring within the prison in order to carry out his statutory duties and could delegate that authority to correctional officials; i.e., the Commissioner has the power within the institutions to maintain public order and enforce the public peace. *Cf.* AS 01.10.060(7)(E) and AS 11.81.-900(b)(39). In fact, according to the introductory language to AS 33.30.231, the purpose of monitoring is to preserve the security and orderly administration of the correctional facility and to protect the public. This analysis is supported by the reasoning of Rambo, J., in *United States v. Clark,* 651 F.Supp. 76, 78–79 (M.D.Pa.1986), *aff'd,* 857 F.2d 1464 (3d Cir.1988), *cert. denied,* 490 U.S. 1073, 109 S.Ct. 2082, 104 L.Ed.2d 646 (1989). I conclude that the Commissioner is vested by law with the power to investigate felonies within the state prisons.

phone conversations by, "an investigative or law enforcement officer in the ordinary course of his duties," and § 2511(2)(c) allows interception where, "one of the parties to the communication has given prior consent to such interception."

 Several courts have held that prison officials are "investigative or law enforcement officers" within the meaning of the statute, and that routine monitoring pursuant to an established policy is "in the ordinary course of [their] duties." I am satisfied that the Ninth Circuit will reach the same conclusion if and when it considers this issue. The government relies upon that exception in this case and I believe that the reliance is warranted. The defendants do not deny that the interception and recording of the calls between Douglas and Peggy occurred in conformity with a pre-established institutional plan that was not specifically aimed at them. Rather, defendants reason as follows: 1) The interception in this case was accomplished by state employees; 2) whether these employees were acting "in the ordinary course of [their] duties" is a question of state law; 3) under state law, to be "in the course of [their] duties," where those duties consist of prison monitoring, one must be in strict compliance with the statute and regulation authorizing prison interception of inmate calls; and 4) state statutes and regulations authorize such interception only if inmates are given prior notice that their calls will be monitored or recorded. In the defendants' view, this means that if officials are going to randomly monitor telephone calls, they must give notice of such monitoring, and if they are going to record, they must give notice of the recording. Here, the officials gave notice of monitoring but did not give notice of recording; ergo, the defendants argue that the officials were not acting "in the ordinary course of [their] duties." The government argues, and the magistrate agreed, that if monitoring is lawful, recording of the monitored conversations is lawful. There is substantial authority supporting this proposition. *United States v. Miller,* 720 F.2d 227, 228 (1st Cir.1983), *cert. denied,* 464 U.S. 1073, 104 S.Ct. 984, 79 L.Ed.2d 220 (1984) (Title III only proscribes unlawful interceptions defined as listening or monitoring of telephone conversations, not the recording of monitored conversations, hence if monitoring is lawful, recording is always lawful); *see United States v. Harpel,* 493 F.2d 346, 350 (10th Cir.1974); *cf. United States v. Suarez,* 906 F.2d 977, 982 (4th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 790, 112 L.Ed.2d 852 (1991) (Title III clearly distinguishes between interception defined as oral monitoring and recording), *United States v. White,* 401 U.S. 745, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1971), *reh'g denied,* 402 U.S. 990, 91 S.Ct. 1643, 29 L.Ed.2d 156 (if conversation is legally overheard, then recording standing alone cannot violate the Fourth Amendment), *Lopez v. United States,* 373 U.S. 427, 83 S.Ct. 1381, 10 L.Ed.2d 462 (1963), *reh'g denied,* 375 U.S. 870, 84 S.Ct. 26, 11 L.Ed.2d 99 (to same effect). These cases turn on the definition of intercept, which means to listen to someone's conversation through the use of a mechanical device. Recording devices do not accomplish the interception, they merely record a conversation that has already been intercepted. Consequently, if the initial interception, i.e. monitoring, is legal, subsequent recording is also legal. *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), does not contradict this conclusion. In *Katz,* the Supreme Court invalidated a recording on Fourth Amendment grounds, but only because the circumstances established that the police could not have lawfully overheard the conversations they recorded. *Id.* at 363, 88 S.Ct. at 517 (White, J., concurring). Thus a recording of a telephone conversation could be an interception under § 2510(4), but only if the conversation could not be heard by the human ear listening to the same telephone. *See In the Matter of John Doe Trader No. One,* 722 F.Supp. 419, 421–23 (N.D.Ill.1989), *aff'd,* 894 F.2d 240 (7th Cir.1990). It is not contended that the equipment available to the prison officials wouldn't have permitted their monitoring of the conversations in dispute between the parties, only that the prison officials preferred recording. Thus, Magistrate Judge Branson is probably correct that on these facts, if there is a right to lawfully intercept, i.e. monitor, under Title

III, that right establishes a right to record.[9]

There is an independent basis for arriving at the same result the magistrate reached but for slightly different reasons. The phrase "in the ordinary course of his [her] duties" occurs in a federal statute, not a state statute. Thus, state law is irrelevant to its interpretation. The Supreme Court has directed that the meaning of a federal statute be determined according to the plain meaning of the language Congress used. Courts are not permitted to search for hidden intent or to read into a statute meaning that was not intended. Nor are courts permitted to borrow from state law unless expressly permitted to do so. See F.D. Rich Co., Inc. v. Industrial Lumber Co., Inc., 417 U.S. 116, 126–31, 94 S.Ct. 2157, 2163–66, 40 L.Ed.2d 703 (1974) (rejecting efforts to interpret Miller Act provisions in light of state law). Here, Congress's meaning is clear: The phrase "ordinary course of duties," like the analogous phrase, "in the course and scope of employment," refers to traditional agency law. See, e.g., Restatement (Second) of Agency §§ 228–30 (1958).[10] The distinction that Congress is drawing is between those whose interception occurs within the scope of their employment generally, i.e. communication workers, and those whose specific and "ordinary duties" must involve monitoring telephone communication. Certainly, the instructions the State, as the employer, gave to its agents are relevant to a determination of whether they were acting "in the ordinary course of [their] duties," but no single rule or regulation would be controlling. Cf. United States v. Caceres, 440 U.S. 741, 752, 99 S.Ct. 1465, 1471, 59 L.Ed.2d 733 (1979) (agency's violation of its own regulations limiting interception of communication does not ipso facto violate Title III or the Fourth Amendment.) Viewed in this way, it is clear that the interceptions in this case satisfy the statute. It is undisputed that the recording was routine, that it was conducted by state employees and was authorized by their supervisors, and that it was undertaken for the purpose of safeguarding the institution, rather than to obtain evidence of a specific crime. When we bear in mind that the issue is what the employees' ordinary duties were and not whether they complied with state law, it becomes clear that whether they did or did not give proper notice, as required by state law, is only relevant as evidence that there was some kind of established policy and that Douglas and Peggy were not the targets of an isolated investigation.[11] It is not contended that the state employees were engaged in a frolic and detour of their own. Cf. Restatement (Second) of Agency § 235 (1958). The only cases in which a court has held that a prison officer was acting outside of her "ordinary duties" when monitoring a prisoner's communications involve the ad hoc monitor-

9. Defendants rely heavily on State v. Glass, 583 P.2d 872, 876–77 (Alaska 1978), which expressly rejects the reasoning of White and Lopez, and which arguably does distinguish between lawful interception and lawful recording of the intercepted conversation. I say "arguably" because the Alaska Supreme Court and the authorities upon which it relies apply equally to prevent broadcasting, i.e., monitoring and recording. There is no express distinction drawn between the two processes. I think the Alaska Supreme Court would hold that if monitoring a conversation didn't violate the state constitution, recording the monitored conversation wouldn't either. It is not necessary to decide this issue, however, because it is a federal statute we are interpreting, and the interpretation must be in light of federal, not state, law.

10. See Horace Mann Ins. Co. v. Analisa N., 214 Cal.App.3d 850, 263 Cal.Rptr. 61, 63 (4th Dist. 1989) (finding the phrase "within the scope of the employee's duties" synonymous with the language "within the scope of employment," using a meaning that the ordinary layperson would understand).

11. I realize that a number of circuit court decisions list notice in conformity with prison regulations as part of a laundry list of reasons why a particular interception was within the interceptor's "ordinary duties." On close examination it is clear that it is the routine nature of the monitoring and recording that is crucial, and not the nature of the notice. Notice tends to confirm that the monitoring is routine. The adequacy of the notice only becomes a central concern when the issue is whether there was implied consent under § 2511(2)(c). I will address that issue separately. But cf. Jandak v. Village of Brookfield, 520 F.Supp. 815, 823–25 (N.D.Ill.1981) (placing emphasis on notice in determining duties but never explaining why notice is relevant). It is instructive that defendants have found no case where interception was found not to be within the ordinary course of duties solely because of the form of notice given.

ing of a single inmate, *cf. Campiti v. Walonis*, 611 F.2d 387, 390–92 (1st Cir.1979). That situation is not present here.

This interpretation of the statute finds support in a comparison of § 2510 with other sections of the same act. Congress has not expressly modified the reference to the scope of duties in § 2510 to limit its broad sweep, as it did in § 2511(2)(a),[12] nor as it did in § 2511(2)(b), by reference to other federal laws.[13] Congress did not modify the exemption for law enforcement officers acting in the "ordinary course of [their] duties" in § 2510(5)(a)(ii) by reference to any other statute or standard.

Nor did Congress expressly incorporate state law by reference as it did in § 2516(2) (relating to state prosecutors seeking and state judges issuing warrants to intercept if, but only if, a state law authorizes the state judge to issue the warrant to intercept); and in § 2510(7), which defines "investigative or law enforcement officer" to include officers of a state. Congress did not incorporate into § 2510(5)(a)(ii) any reference to state law.[14]

Consequently, the fact that the state officials monitoring the calls between Douglas and Peggy may not have strictly complied with the applicable state statute and regulations by notifying Douglas that his calls would be recorded as well as monitored is of no legal significance, since any such deviation would not be sufficient to take the recording out of the "ordinary course of [the prison official's] duties." Restatement (Second) of Agency § 229 (1958).

My conclusion that the recording here was done in the ordinary course of the duties of the prison officials makes it unnecessary for me to address the second theory advanced by the government and adopted by the magistrate: Implied consent. It is clear that Congress did intend to permit findings of implied as well as express consent. *See* April 29, 1968, Pub.L. No. 90–351, 1968 U.S.C.C.A.N. (90 Stat.) 2112, 2182 (Consent may be express or implied. Surveillance devices in banks or apartment houses for institutional or personal protection would be impliedly consented to). One court has held that use of a telephone in a prison setting with notice that it is being monitored constitutes implied consent. *See United States v. Willoughby*, 860 F.2d 15, 19–20 (2d Cir.1988), *cert. denied*, 488 U.S. 1033, 109 S.Ct. 846, 102 L.Ed.2d 978 (1989). I share the concern expressed by the Seventh Circuit in *United States v. Daniels*, 902 F.2d 1238, 1244–45 (7th Cir.1990), *cert. denied*, 498 U.S. 981, 111 S.Ct. 510, 112 L.Ed.2d 522, that this reasoning turns acquiescence into implied consent. In the examples used by Congress, a person aware of surveillance was arguably being benefited by it and could avoid it by going somewhere else, while a prisoner either uses institutional phones or is cut off from the outside world. There is no suggestion that Douglas or Peggy were benefited by the recording in this case. While this may be a necessary price for prison security, and I have found that it is, it tortures the meaning of the word to call it consent. *Cf. Griggs–Ryan v. Smith*, 904 F.2d 112, 116–17 (1st Cir.1990) (discussing the requisites for a finding of implied consent).[15] I decline to find

12. 18 U.S.C. § 2511(2)(a) provides:
 It shall not be unlawful [for various employees of communication common carriers], whose facilities are used in the transmission of a wire communication, to intercept, disclose or use that communication in the normal course of his employment while engaged in any activity which is a necessary incident to the rendition of his service or to the protection of the rights or property of the carrier of such communication: *Provided*, That said communication common carriers shall not utilize service observing or random monitoring except for mechanical or service quality control checks.

13. 18 U.S.C. § 2511(2)(b) permits interception of communications by agents of the Federal Communications Commission "in the normal course

of [their] employment" when discharging their monitoring responsibilities under Title 47 of the United States Code.

14. If state law were relevant, it would be the law determining the scope of an employee's duties, not the law regarding the interception of prisoners' communications, because the statute we are interpreting addresses the former. Alaska views scope of employment liberally. *See Doe v. Samaritan Counseling Center*, 791 P.2d 344, 346–50 (Alaska 1990).

15. The government relies upon *United States v. Sanford*, 673 F.2d 1070, 1071–72 (9th Cir.1982), and by extension, *U.S. v. Glickman*, 604 F.2d 625, 633–34 (9th Cir.1979), *cert. denied*, 444 U.S.

consent in this case.[16]

I therefore conclude that defendants' motions to suppress the prison intercepts at Docket Nos. 310 and 381 should be and are DENIED.

### B. *The warrant for interception.*

The three defendants challenge the warrant Chief Judge Holland issued in this case to permit bugging and wiretapping, at Docket Nos. 331, 383 and 384. *See* 18 U.S.C. § 2518. Their challenges present three discrete issues. First, is the warrant, considered in light of the supporting affidavit, deficient on its face? *See* § 2518(10)(a)(ii). This is essentially a question of law, except that the motion judge must give deference to the issuing judge's ruling on necessity. *United States v. Brone,* 792 F.2d 1504, 1506 (9th Cir.1986). Conse-quently, there is no need for an evidentiary hearing to resolve this issue. *United States v. Batiste,* 868 F.2d 1089, 1092 (9th Cir.1989). I have carefully reviewed the warrant and the affidavit and find that both comply with § 2518. The affidavit is not wholly conclusory. It describes in some detail an extensive investigation, specific reasons for doubting that other investigative techniques would uncover the necessary evidence or that additional non-electronic investigation would fully disclose the extent of the defendants' conspiracy, and it provides reasonable guidelines for minimization. Chief Judge Holland clearly acted within his discretion in finding that the warrant was necessary, and the parties raise no significant issues regarding other aspects of the warrant. They specifically do not challenge Chief Judge Holland's conclusion that there was probable cause to believe

---

1080, 100 S.Ct. 1032, 62 L.Ed.2d 764 (1980), for the proposition that anytime a person knows he is being recorded and persists, he impliedly consents to the recording. Those cases are easily distinguished on their facts. In each case an informant willingly wore a wire and extracted incriminating information from the defendant. The government put on no evidence that the informant expressly consented to having the conversation recorded. The court found implied consent uttering the dicta relied upon by the government. It is reasonable to say that an informant who is wired in part for his own protection in order to enable him to seduce a friend consents to the monitoring because it is for his benefit and he would have no obvious reason for objecting. In contrast the prison inmate who either uses the phone or is isolated from the outside world is hardly benefited by the recording and may have many reasons for disapproving of recording. Therefore, it is not reasonable to imply his consent as opposed to acquiescence. In fact the code used by the defendants indicates they did not wish their conversations overheard. It is true that the courts are more willing to imply consent to record a conversation than they are to find consent to invade a residence, but that is not because the legal test is different. It is simply that as a reasonable inference from the facts, the average person is less concerned to have strangers eavesdrop on her conversations than she would be to have strangers rummage through her home.

**16.** Defendants request a further evidentiary hearing to put on evidence regarding state compliance with state statutes and regulations and inmate knowledge that their telephone conversations were being recorded. In my view none of the proposed evidence would be material to a resolution of the issue. Even if we assume that

the state employees deviated from what Alaska Courts might someday conclude were the regulations governing recording of inmate telephone conversations, the deviations were not sufficiently extreme to take the employees' actions outside their regular duties. Since I have not decided the case on the basis of implied consent, evidence regarding what inmates knew or didn't know is likewise irrelevant. I therefore DENY the motions for further evidentiary hearings at DOCKET NOS. 581 and 582.

Defendants also ask for oral argument. There is no definitive decision of the United States Supreme Court or the Ninth Circuit court of appeals. Defendants' arguments are not frivolous. On the other hand, the facts and legal arguments are adequately presented in the briefs and record and the decisional process would not be significantly aided by oral argument on this issue. Defendants want to argue that failure to give advance warning that conversations would be recorded as well as monitored so clearly violated the statute and regulations that this court should not find the recording to be within the ordinary duties of the employees. While I don't think the state statutes were violated and am confident that the Supreme Court of Alaska would find the recorded evidence in this case admissible in state court despite its more protective view of privacy, I don't think the state statutes or regulations governing monitoring or recording of inmate telephone conversations define the employees' regular duties. Their job description does that. All of the courts that have addressed the issue find routine recording of inmate telephone conversations to maintain institutional safety to be within the job description of similarly situated employees. That is enough to satisfy the statute.

that Cheely, Douglas and Peggy were guilty of the named offenses.

■ The second issue involves the integrity of the affidavit. *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). A defendant may challenge an affidavit in support of a search warrant by showing that the affiant made intentionally false or reckless statements. Before a hearing is necessary, however, the defendant must point to specific statements in the affidavit which are alleged to be false and support the claim of falsity by admissible evidence in the form of affidavits or an explanation of the reason that affidavits are unavailable. *Id.* at 171, 98 S.Ct. at 2684. No defendant has made the showing required by *Franks* by presenting evidence that any statement in any of the affidavits was intentionally or recklessly falsified; and therefore, no evidentiary hearing on this issue was required. Defendants rely upon *United States v. Ippolito,* 774 F.2d 1482 (9th Cir.1985), and *United States v. Simpson,* 813 F.2d 1462, 1471–73 (9th Cir.1987), *cert. denied,* 484 U.S. 898, 108 S.Ct. 233, 98 L.Ed.2d 192 but both of these cases involved application of *Franks* in the Title III context and are therefore inapposite.

■ The third and final issue involves the implementation of the search and whether reasonable efforts were made to minimize the invasion of privacy incident to the authorized search, or whether the scope of the search exceeded that which was authorized. Adequate minimization requires an objective assessment of a law enforcement agent's actions in light of the facts and circumstances of the particular case. The standard is one of reasonableness. *United States v. Chavez,* 533 F.2d 491, 492–93 (9th Cir.1976), *cert. denied,* 426 U.S. 911, 96 S.Ct. 2237, 48 L.Ed.2d 837. Initially, the government must come forth with evidence in affidavit form establishing that it made reasonable efforts to minimize the intrusion. *United States v. Santora,* 600 F.2d 1317, 1320 (9th Cir.1979), *modified,* 609 F.2d 433. Consistent with the general rules governing motion practice, the burden is then on the defendants to submit evidence to establish a dispute about the historical facts. In the absence of a factual dispute, no evidentiary hearing is necessary and the case may be decided on the government's evidence. *Batiste* at 1092–93. The government filed the requisite affidavit, which I have reviewed. It satisfies the government's obligation to make a *prima facie* case regarding minimization. *See* Docket No. 364, Exhibit B, affidavit of Douglas Pulling. The affidavit established that prior to intercepting any call, the monitoring agents were instructed as to the requirements and need for minimization; they read a memorandum on the topic which, while skewed in perspective towards the government's view of the law, does address the paramount privacy concerns, (i.e., privileges), and they read the affidavit and the warrant. Also, it appears that the monitoring agents were told where they could contact the assigned Assistant United States Attorneys twenty-four hours per day. *See* Docket No. 364, Exhibit C, Bonner Memorandum. The government also alleged that a substantial number of the calls intercepted were minimized. The government's showing also satisfied 18 U.S.C. § 3504, in the absence of controverting evidence submitted by the defendants. *In re Grand Jury Proceedings,* 889 F.2d 220, 223 (9th Cir.1989); *U.S. v. Gardner,* 611 F.2d 770, 774 (9th Cir.1980). The defendants filed no countervailing affidavits specifically disputing any historical fact alleged in the government's affidavit; and consequently, no evidentiary hearing was required. However, Magistrate Judge Branson elected to hold a hearing, and I have obtained a transcript of the hearing and have reviewed it. I have also reviewed the exhibits which were introduced and discussed during the hearing. It appears that one conversation with an attorney was recorded and that a number of conversations between Peggy and her husband were recorded. The government's argument that the spousal privilege was inapplicable because there was a child present during the conversation is weak. Nevertheless, an evaluation of the whole record leads me to conclude that the reasonableness test was met. In *Scott v. United States,* 436 U.S. 128, 136–39, 98 S.Ct. 1717, 1723–24, 56 L.Ed.2d 168 (1978), *reh'g denied,* 438 U.S. 908, 98 S.Ct. 3127, 57 L.Ed.2d 1150, the court held that a reviewing judge must evaluate

the officers' actions by an objective standard, taking into account what the officers knew at the time they attempted minimization. When we consider the information known to the officers when the surveillance began, the length of the surveillance (thirty days), the nature of the conspiracy shown (an effort by a small group of friends and family members to eliminate those who had testified against and participated in the prosecution of Cheely and Douglas at an earlier trial), the duration of the calls, the ambiguity of some of the calls, the fact that Douglas and Peggy had used code in the past, and the fact that Cheely and Douglas had been betrayed by close friends in the past and could be expected to be cautious in their conversations, I am satisfied that adequate minimization occurred. *Scott*, 436 U.S. at 139–43, 98 S.Ct. at 1724–26. Defendants have not identified anything in the record to suggest a contrary conclusion. They do not single out any specific conversations which should be suppressed, except perhaps the telephone call to Mr. McComas, nor do they suggest by specific reference to the record which intercepted calls establish a clear pattern of interception of innocent calls.[17] Therefore, it is not necessary to determine whether the general rule requiring suppression of evidence obtained in excess of the authority granted by the warrant, (i.e., the non-minimized conversations), applies. *See United States v. Chen*, 979 F.2d 714, 716 (9th Cir.1992); *United States v. Tamura*, 694 F.2d 591, 597 (9th Cir.1982). There was clearly no flagrant disregard of the minimization requirement such as would be necessary to suppress more than the innocent calls. *See Chen*, slip op. at 1–2.

Defendants' motions at Docket Nos. 331, 383 and 384 to suppress the results of the wiretaps authorized by Chief Judge Holland are therefore DENIED.

## GOVERNMENT'S MOTION FOR THE ADMISSION OF PHOTOS

■ The government seeks a pre-trial admission of certain arguably gruesome photographs. The motion at Docket No. 324 is DENIED. The trial judge will have to balance probative value against possible prejudice in the context of the trial and the issues as they develop. A pre-trial ruling on this issue would be premature. Fed.R.Evid. 403; *United States v. Adrian*, 978 F.2d 486 (9th Cir.1992) (stressing the importance of contextual balancing).

IT IS THEREFORE ORDERED:

The government's motion at Docket No. 324 is DENIED; both with respect to its motion to dismiss for lack of subject matter jurisdiction, and as to its request for an order permitting the pre-trial admission of the photographs.

The government's motion at Docket No. 387, for an order permitting it to try defendant Peggy Gustafson–Barnett first and then to proceed to trial against Raymond Cheely and Douglas Gustafson is GRANTED.

Defendants' motions for a *de novo* evidentiary hearing, at Docket Nos. 581 and 582 are DENIED. In addition, defendants' motions

---

17. In order to raise a significant issue regarding minimization in a case such as this case in which the government has made a *prima facie* case of minimization in conformity with *United States v. Torres*, 908 F.2d 1417, 1423–24 (9th Cir.1990), *cert. denied*, 498 U.S. 905, 111 S.Ct. 272, 112 L.Ed.2d 228 and 498 U.S. 948, 111 S.Ct. 366, 112 L.Ed.2d 329, a defendant should make some showing by admissible evidence, which might be the discovery it obtained from the government, that the government either seeks to admit specific conversations that they should have minimized or persisted in a pattern of intercepting calls under circumstances where the calls were of sufficient length and the subject matter sufficiently clear that the calls could have no possible relation to the subject of the surveillance. *Torres*, 908 F.2d at 1423.

In *United States v. Orozco*, 630 F.Supp. 1418, 1538–39 (S.D.Cal.1986), the court ordered an evidentiary hearing regarding a pattern of recording telephone calls between lovers discussing only their recreational and love life. It is not suggested that Peggy and her husband were discussing intimate matters in the presence of their child when their calls were intercepted. The government clearly considered Peggy's husband a potential conspiracy member, although it is not contended that they had probable cause to arrest him. Under the circumstances presented by this record, it is not necessary to determine whether § 2517(4) (general authorization for government agents to disclose intercepted material does not necessarily abrogate evidentiary privileges) merely prevents use in evidence of communications within the husband-wife privilege or somehow limits otherwise valid interceptions.

to suppress evidence obtained through warrantless electronic interceptions, at Docket Nos. 310 and 381, and their motions to suppress evidence obtained pursuant to a warrant at Docket Nos. 331, 383 and 384, are DENIED.