Robert HUGUENIN, et al., Edward Manning, Jr., James O'Neil, et al., Plaintiffs,

v.

Joseph PONTE and Cornell Corrections, Inc., a/k/a Cornell Cox Management Rhode Island, Inc., d/b/a Cornell Corrections, as Operators of the Donald W. Wyatt Detention Facility, Central Falls, Rhode Island, Defendants.

Nos. CA 96–026ML, 96–037ML, 96–048ML.

United States District Court, D. Rhode Island.

Nov. 24, 1998.

58

Thomas G. Briody, Providence, RI, for plaintiffs.

Philip M. Weinstein, Amelia Edwards, Providence, RI, for defendants.

## MEMORANDUM AND ORDER

LISI, District Judge.

This case is before the Court for decision pursuant to Fed.R.Civ.P. 56. Defendants filed a motion for summary judgment on September 30, 1996; Plaintiffs filed separate objections and cross motions for summary judgment on October 4, 1996. On April 9, 1997, separate Reports and Recommendations issued from the United States Magistrate Judge. The parties objected to the Magistrate's findings. At the request of this Court, the parties supplemented their filings in support of their respective motions for summary judgment.

The parties have consolidated their claims for purposes of summary judgment, and the matter is now in order for decision. For the reasons stated herein, the Court denies the parties' motions for summary judgment.

## I. FACTS

### A. Background

Plaintiffs Edward Manning, Jr., and James O'Neil are attorneys licensed to practice law in the State of Rhode Island. At all times relevant to this action, Plaintiffs Patrick Meade and Robert Huguenin were inmates at the Donald W. Wyatt Detention Facility ("Wyatt") in Central Falls, Rhode Island. The remaining plaintiffs were the recipients of phone calls that either Meade or Huguenin made while detained at Wyatt. Defendant Joseph Ponte was the Director of Wyatt at all times relevant to this action; Defendant Cornell Corrections, Inc. ("Cornell"), was the private corporation that operated Wyatt during the relevant time period.

Plaintiffs' complaints allege that during 1993 and 1994, Defendants intercepted various telephone calls that had originated from the Inmate Telephone System at Wyatt.[1] Plaintiffs claim that these interceptions violated 18 U.S.C. §§ 2510–2520 (1994 & Supp. II 1996) ("the Act"), which prohibits the interception of certain electronic, oral, or wire communications. Plaintiffs also assert that Defendants' conduct violated R.I.Gen.Laws §§ 12–5.1–1 to 12–5.1–13 (1994 Reenactment), the Act's state law counterpart.[2]

Defendants deny the allegations, and assert that the Act provides two exceptions which shield them from liability. The first exception, contained at 18 U.S.C. § 2510(5)(a)(ii), relieves from liability an "investigative or law enforcement officer" who intercepts communications while acting "in the ordinary course of his duties." The second exception on which Defendants rely pro-

---

1. Plaintiff Robert Huguenin claims that Defendants, through their agents and employees, intercepted telephone calls which he made to Plaintiffs Roland Huguenin, Sandra Feuti, and Linda Bozzi. He claims that Defendants intercepted these communications during January and February of 1994. Plaintiff Manning claims that Defendants, through their agents and employees, intercepted confidential and privileged legal communications that related to legal representation he provided to various detainees at Wyatt. Manning claims that these interceptions occurred between December 1, 1993 and September 30, 1994. Plaintiff O'Neil claims that Defendants, through their agents and employees, intercepted confidential and privileged legal communications that related to his representation of Plaintiff Meade. These interceptions allegedly occurred from about December 23, 1993 until November 4, 1994. Plaintiff Patrick Meade claims that Defendants intercepted conversations to which Plaintiffs Mary Meade, Joseph Meade, Marguerite Meade, Maura Meade, and Plaintiff John Rooney were parties.

2. The Supreme Court of Rhode Island has stated that Rhode Island's wiretapping statute "closely parallels" the federal statute. *See Pulawski v. Blais*, 506 A.2d 76, 77 n. 1 (R.I.1986). That court has also stated that the federal statute "preempt[s] the field in wiretap." *Id.* at 77.

vides that an individual may intercept a communication where one of the parties to the communication has given prior consent to the interception. *See* 18 U.S.C. § 2511(2)(d). Finally, Defendants argue that Plaintiffs Robert Huguenin and Patrick Meade failed to exhaust administrative remedies set forth in the Federal Bureau of Prisons regulations.

The Court will address each of these claims in due course, but before undertaking any further analysis it is necessary to provide a complete picture of Wyatt, its management, and operation.

### B.  The Wyatt Detention Facility

As previously stated, the Wyatt Detention Facility is located in Central Falls, Rhode Island. Cornell has managed and operated Wyatt since 1993 pursuant to a contract with the Central Falls Detention Facility Corporation ("CFDFC"). The CFDFC is a creature of Rhode Island statute.

Chapter 54, title 45 of the General Laws of Rhode Island provided for the creation of a municipal detention facility corporation in each city and town of the state.[3] *See generally* R.I.Gen.Laws §§ 45–54–1 to 45–54–28 (1991 Reenactment). The statute was intended to promote the construction of a detention facility in Rhode Island and to augment economic development within the state. *See* R.I.Gen.Laws § 45–54–2. The CFDFC created Wyatt in compliance with this statute. The CFDFC owns the facility.

Pursuant to its statutory authority, *see* R.I.Gen.Laws § 45–54–6(n), the CFDFC entered a contract with Cornell in July, 1992. Pursuant to that contract, Cornell was to operate the facility for a period of five years from the date that it received its first inmate. Cornell's employees provided the security services at Wyatt during all times relevant to this complaint.[4]

Wyatt received its inmates pursuant to two contracts that the CFDFC entered. The signatories to the first contract, or Intergovernmental Service Agreement (IGA), were the CFDFC and the United States Marshals Service. Pursuant to this agreement, Wyatt would house approximately 290 federal prisoners.[5] The second contract was binding upon the State of North Carolina and the CFDFC. Under this contract the CFDFC agreed to house certain inmates that the State of North Carolina delivered to Wyatt.[6] The latter contract is of little moment to the dispute in this case.

Subject to the supervision of the United States Marshals Service and the CFDFC's "Contract Monitor,"[7] Cornell has housed federal prisoners since the fall of 1993.

With this foundation in place, the Court now proceeds to analyze the parties' contentions in light of the standard of review and the law that governs the facts of this case.

## II.  STANDARD OF REVIEW

In deciding a motion for summary judgment, a court must consider whether the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). As the

---

3.  Pursuant to § 45–54–1(c) of the General Laws, those corporations would cease to exist after December 31, 1991, if the city or town council in a given municipality failed to pass certain resolutions, enter certain contracts, or secure certain zoning approvals.

4.  For purposes of this opinion, the Court considers the terms "Cornell's employees" and "Wyatt's employees" to be interchangeable.

5.  The IGA has a self-renewing provision which allows a party to terminate the contract upon written notice. The record facts do not indicate that the parties have terminated the IGA.

6.  This contract did not provide for a specific number of inmates. Instead, it appears that the CFDFC reserved a right to approve or reject any proposed transfer of an inmate from North Carolina.

7.  The agreement between the CFDFC and Cornell defines "Contract Monitor" as that person who "acts as the [CFDFC's] consultant" with respect to Wyatt and the agreement. The "Contract Monitor" monitors Defendant's performance under the contract and enjoys, *inter alia*, the right to make unannounced visits to the facility and the right to access inmate records and data.

Pursuant to the IGA, the United States Marshals Service may inspect Wyatt periodically.

Supreme Court of the United States has explained, "the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Generally, the movant must demonstrate that "no genuine issue of material fact exists." *National Amusements, Inc. v. Town of Dedham,* 43 F.3d 731, 735 (1st Cir.1995).

Once the movant has satisfied this burden, the burden shifts to the non-movant who must "point[ ] to specific facts demonstrating that there is, indeed, a trialworthy issue." *See id.* An issue is "genuine" if it is "sufficiently open-ended to permit a rational factfinder to resolve the issue in favor of either side." *Id.* A fact is "material" if it might "sway the outcome of the litigation under the applicable law." *Id.* Cross motions for summary judgment do not affect the basic application of these rules; they simply require a court to determine whether either party "deserves judgment as a matter of law on facts that are not disputed." *See Wightman v. Springfield Terminal Ry. Co.,* 100 F.3d 228, 230 (1st Cir.1996).

### III.  DISCUSSION

#### A.  *Relevant Statutory Provisions*

Section 2520 of the Act, 18 U.S.C. §§ 2510–2520 (1994 & Supp. II 1996), creates a federal cause of action in favor of any person whose oral communication is intercepted in violation of the Act.[8] Section 2511(1)(b) provides that any person who intentionally uses any "electronic,' mechanical, or other device" to intercept an oral communication has violated the Act. Defendants propose two theories to explain why they are not liable for damages under the Act.

Pursuant to § 2510(5)(a)(ii), the definition of "electronic, mechanical, or other device," as used in § 2511, does not include "any telephone or telegraph instrument, equipment or facility, or any component thereof ... being used ... by an investigative or law enforcement officer in the ordinary course of his duties."[9] Defendants argue that this language removes them from the group of persons that is subject to suit for intercepting oral, wire, or electronic communications.

Defendants also proffer another theory for the Court's consideration. They contend that the Act's consent exception relieves them from liability for any interception that might otherwise violate the terms of the statute. *See* 18 U.S.C. § 2511(2). Essentially, this exception relieves from liability one who intercepts a communication where one of the parties to that communication has consented to the interception. Defendants contend that the inmates impliedly consented to such interceptions because they had received notice upon entering Wyatt that conversations on the Inmate Telephone System might be monitored. If this contention proves true, Defendants have a complete defense to Plaintiffs claims.

#### B.  *Investigative or Law Enforcement Officer*

The Act defines "[i]nvestigative or law enforcement officer" to be "any officer of the United States or of a State or political subdivision thereof, *who is empowered by law to conduct investigations of or to make arrests for offenses enumerated in this chapter.*" 18 U.S.C. § 2510(7) (emphasis added). Plaintiffs argue that Defendants do not meet the definition of investigative or law enforcement officers under § 2510(7); Defendants argue that they are included in that definition be-

---

**8.** Section 2520(b) provides that a plaintiff may seek equitable or declaratory relief, money damages, reasonable attorney's fees, and other litigation costs that are reasonably incurred in prosecuting the action. Punitive damages may be awarded in appropriate cases. Section 2520(c) provides a statutory measure of damages.

**9.** The Reports and Recommendations that issued from the Magistrate Judge did not treat the definition of "investigative or law enforcement offi-

cer" that applies to § 2510(5)(a)(ii). Instead, the Magistrate Judge found that Defendants did not act in "the ordinary course of [their] duties," and therefore, the exception did not apply. Since this Court has determined that Defendants were not "investigative or law enforcement officer[s]" for purposes of the Act, no discussion of the statute's "ordinary course" language is necessary.

cause Wyatt is owned and supervised by the city of Central Falls through the CFDFC.

This matter presents a question of statutory construction. In *Estate of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 475, 112 S.Ct. 2589, 120 L.Ed.2d 379 (1992), the Supreme Court of the United States admonished that in statutory construction cases, "the beginning point must be the language of the statute, and when a statute speaks with clarity to an issue judicial inquiry into the statute's meaning, in all but the most extraordinary circumstance, is finished." Moreover, courts should construe a statute's language consistent with its clear and ordinary meaning. *See id.* at 476, 112 S.Ct. 2589; *Hogan v. Bangor and Aroostook R.R. Co.*, 61 F.3d 1034, 1037 (1st Cir.1995).

The Act's definition of "[i]nvestigative or law enforcement officer" includes only those who are: (1) empowered by law; (2) to conduct investigations of or to make arrests for; (3) offenses enumerated in this chapter. To facilitate the analysis of the statute's language, perhaps it is easiest to consider the last element first.

Section 2516(1) of the Act gives the Attorney General of the United States, and various other Attorneys General, the power to apply to a federal judge for an authorization to intercept certain wire, oral, or electronic communications. Section 2516(2) grants a similar power to certain state or local prosecuting attorneys. Pursuant to each subsection, the relevant federal, state, or local prosecuting attorney may apply for authorization to intercept a communication only when the interception would or might provide evidence of certain crimes. The list of federal crimes is comprehensive, covering crimes that range from the sabotage of nuclear facilities to the manufacture and importation of narcotic drugs. *See* 18 U.S.C. § 2516(1)(a)–(p). The list of state crimes is not as exhaustive, encompassing, *inter alia*, murder, kidnapping, gambling, robbery, bribery, extortion, crimes

related to narcotic or dangerous drugs, and other violent crimes punishable by imprisonment for more than one year. *See* 18 U.S.C. § 2516(2). These subsections of § 2516 comprise the only enumeration of offenses in the Act. *See United States v. Cheely*, 814 F.Supp. 1430, 1440 n. 8 (D.Alaska 1992), *aff'd*, 21 F.3d 914 (9th Cir.1994), *modified*, 36 F.3d 1439 (9th Cir.1994) (noting that the relevant enumeration of offenses for purposes of § 2510(7) appears to be § 2516(2)); *Jandak v. Village of Brookfield*, 520 F.Supp. 815, 822 (N.D.Ill.1981) (noting that the relevant enumeration of offenses is contained in § 2516).

■ Before a federal, state, or local officer has satisfied the strictures of § 2510(7), that officer must also be "empowered by law to conduct investigations of or to make arrests for" the crimes that § 2516 prescribes. An officer who has no lawful authority to engage in one of these functions is not within the exception that § 2510(5)(a)(ii) creates, and is subject to suit for money damages under the Act. Whether Wyatt's employees were "empowered by law" requires an analysis of the relevant state and federal statutes.[10]

### 1. Relevant State Statutes

■ Defendants contend that this Court should grant summary judgment in their favor because they, and their agents, are employees of the city of Central Falls, Rhode Island. Defendants travel a circuitous route in arriving at this conclusion.

The statute that created the CFDFC, a public corporation, granted the CFDFC the power to operate and manage, through a board of directors, any project or facility constructed pursuant to Chapter 54. *See* R.I.Gen.Laws §§ 45–54–2 to 45–54–6 (1991 Reenactment). Defendants asseverate that because Wyatt is subject to the management and supervision of the CFDFC, its employees are, for purposes of 18 U.S.C. § 2510(7), "officers of a State or political subdivision

---

10. The definition contained in § 2510(7) appears to incorporate, by reference, those state law provisions that vest certain individuals with the authority to conduct investigations of or to make arrests for the enumerated offenses. *See Cheely*, 814 F.Supp. at 1440 n. 8. This form of incorporation by reference is not uncommon. *See, e.g.*,

*Brooks v. Md. Gen. Hosp., Inc.*, 996 F.2d 708, 714 (4th Cir.1993) (noting that "federal courts may give effect to state law in interpreting the scope of a federal statute if Congress has evinced an intention to give state law persuasive or binding effect.").

thereof." Moreover, Defendants contend that they are "empowered by law" by virtue of the CFDFC's decision to utilize their services. This argument flouts the plain language of § 2510(7) and its definition of "[i]nvestigative or law enforcement officer."

The Act insulates from liability only those officers of a political subdivision who are empowered by law to conduct investigations of or to make arrests for the offenses enumerated in § 2516. The General Laws of Rhode Island define both the power to arrest and the power to investigate. Since the latter applies only to county sheriffs, *see* R.I.Gen.Laws § 42-29-18 (1993 Reenactment), and the office of investigation of the department of attorney general, *see* R.I.Gen. Laws § 42-9-8.1 (1993 Reenactment), the Court proceeds directly to an analysis of the former—the power to arrest.[11]

Chapter 7, title 12 of the General Laws defines the power to arrest and the individuals who hold that power. *See generally* R.I.Gen.Laws §§ 12-7-1 to 12-7-21 (1994 Reenactment). As a general matter, the statute grants the power to make an arrest to a "peace officer" as that term is defined in § 12-7-21.[12] That section defines the term "peace officer" to include:

> Rhode Island state police, any member of a municipal or local police department, Rhode Island marshalls [sic], Rhode Island airport corporation police, Rhode Island park police, Rhode Island capitol police, Rhode Island conservation officer, Rhode Island department of environment officer, Rhode Island fire marshals, *Rhode Island correctional officer*, Brown University police officer, University of Rhode Island campus police officer, Rhode Island college [sic] campus security, Rhode Island sheriff's department, Rhode Island drug enforcement officer, investigators of the department of attorney general appointed pursuant to § 42-9-8.1, the director, assistant director, and other inspectors and agents of the Rhode Island state fugitive task force appointed pursuant to § 12-6-7.2, and any federal law enforcement officer.

R.I.Gen.Laws § 12-7-21 (emphasis supplied). Defendants argue that the term "Rhode Island correctional officer," as used in this definition, should include the private contractors at Wyatt. The Court disagrees.

A federal court that engages in the construction of a state statute must follow the state's rules of statutory construction. *See Municipal Util. Bd. of Albertville v. Alabama Power Co.*, 21 F.3d 384, 387 (11th Cir.1994) ("When construing a state statute, we look to state rules of statutory construction, because the same rules of construction apply in a federal court as would apply in a state court."). Absent any guidance as to the construction of this particular provision of state law, the Court proffers a reading that is consistent with the canons of statutory construction as applied by the Supreme Court of Rhode Island. *See Woods v. Friction Materials, Inc.*, 30 F.3d 255, 263 (1st Cir.1994) (noting that the federal courts must follow the state courts' construction of state laws).

In matters of statutory construction, the Supreme Court of Rhode Island will first look to the plain and ordinary meaning of the statute's language. *See Fleet Nat'l Bank v. Clark*, 714 A.2d 1172, 1177 (R.I.1998). Section 12-7-21 does not include Wyatt's private security guards within the definition of "peace officer." While it does endow "Rhode Island correctional officers" with the power

---

**11.** Other bodies also possess limited powers of investigation under the General Laws of Rhode Island. As these bodies bear no relation to the present action, the Court omits them from consideration. *See, e.g.,* R.I.Gen.Laws § 8-16-4 (1997 Reenactment) (granting the state's commission on judicial tenure and fitness the power to investigate).

**12.** Chapter 7, title 12 admits of certain exceptions to the general rule that only a "peace officer" can make an arrest. Section 12-7-18 confers upon certain members of the national guard the power to *detain* individuals in special circumstances. Furthermore, § 12-7-17 gives "employees connected with any institution under the management and control of the department of corrections" the right to arrest escapees and parole violators. Section 12-7-17 is wholly inapposite in the present action as Defendants are not "under the management and control of the department of corrections," and the power to make arrests under this provision of the General Laws does not reach any one of the offenses enumerated in § 2516(2) of the Act.

to arrest, it does so within a string of terms that includes groups of state employees. It would, indeed, be paralogical to assert that the terms "Rhode Island marshalls" [sic] and "Rhode Island conservation officer," as used in § 12–7–21, encompass some unknown group of private employees. Accordingly, this Court declines to read the term "Rhode Island correctional officer" to include any group other than those officers that the State of Rhode Island chooses to employ at its state-run correctional institutions.

From a plain reading of the statute, one also divines a legislative intent not to include Wyatt's employees within the definition contained at § 12–7–21. *See Rison v. Air Filter Sys., Inc.,* 707 A.2d 675, 682 (R.I.1998) (employing the maxim *inclusio unius est exclusio alterius*). The definition of "peace officer" specifically includes individuals who are not members of state, municipal, or local police departments. This category includes, *inter alia,* Brown University police officers— a group of officers who police the campus of a private university. Given this specific and precise enumeration of myriad officers, one can infer that the legislature intended to exclude Wyatt's employees from the definition of the term "peace officer."

Even if the Court determined that § 12–7–21 was ambiguous on its face, the legislative history supports a literal reading of the statute. *See First Republic Corp. of Am. v. Norberg,* 116 R.I. 414, 358 A.2d 38, 41 (R.I. 1976) ("Legislative history is properly used as an aid to construction only when the statute is itself ambiguous."). Plaintiffs have provided the Court with copies of a number of proposed amendments to various bills that were introduced in the General Assembly during the 1995 and 1996 legislative sessions. Particularly apposite for purposes of this discussion are two pieces of legislation that would have refined the definition of "peace officer" in § 12–7–21 to include "correctional officers employed by or through municipal detention facility corporations established pursuant to chapter 54 of title 45." *See* H. 5095, January Sess. (R.I.1995); H. 7677, Jan-

uary Sess. (R.I.1996). While the 1995 version of the amendment contained only the language quoted above, the 1996 amendment added a modifier that would have conferred peace officer status upon a Wyatt employee "only while performing his or her duties and responsibilities at the municipal detention facility." The current language of § 12–7–21 evidences that neither of the proposed amendments passed. This provides yet another reason why the Court should decline Defendants' invitations to rewrite the General Assembly's statute by including Wyatt's employees in the definition of "peace officer" that § 12–7–21 provides.

Pursuant to this interpretation of the relevant state statutes, Defendants' argument fails; Rhode Island's laws do not empower Wyatt's employees to conduct investigations of or to make arrests for the offenses enumerated in 18 U.S.C. § 2516.

### 2. *Relevant Federal Law*

■ Defendants also contend that Wyatt's employees assumed the duties and responsibilities of the United States Marshals Service by virtue of the IGA between the Marshals Service and the CFDFC. Thus they argue that they are, *de facto,* empowered "to conduct investigations of or to make arrests for" the offenses enumerated in § 2516. A careful reading of the contract, relevant case law, statutes, and regulations does not support this position.

### a. *Contractual Arguments*

Cornell argues that as a matter of contract it has assumed the duties of the United States Marshals Service with respect to the inmates at Wyatt. Defendant appears to rely on the IGA to support this proposition.

Pursuant to the IGA, the CFDFC is required to house federal prisoners in "accordance with state and local laws, standards, policies, procedures, or court orders applicable to the operations of the facility."[13] The IGA also provides that the CFDFC will per-

---

**13.** It is worth noting that Cornell is not a signatory to the IGA, rather the CFDFC and the United States Marshals Service are the contracting parties. Thus, it does not appear that Cornell is in privity of contract for purposes of the IGA and its mandates. Nevertheless, pursuant to its agreement with the CFDFC, Cornell has agreed to observe the dictates of the IGA.

mit the United States Marshals Service to make periodic inspections of the facility to monitor its operation.

The fact that Cornell's operating procedures are subject to review by the appropriate governmental agency, here the United States Marshals Service, does not indicate that Defendants have assumed duties or responsibilities that include the power to arrest or to investigate. It does indicate that the Marshals Service enjoys a power of oversight to ensure that Cornell complies with all applicable laws and to verify that it establishes policies that meet the standards propounded in the IGA. Nevertheless, the Marshals Service has neither deputized Wyatt's employees nor accorded them the concomitant power to arrest or to investigate.[14]

A reading of the relevant federal statutes and case law supports this analysis.

### b. Federal Statutes and Case Law

Section 4013, title 18 of the United States Code gives the Attorney General the power to use federal funds to support federal prisoners in non-federal correctional facilities. See 18 U.S.C. § 4013 (1994). That section of the Code also provides that "in order to be eligible" for a contract to house federal prisoners, a private entity must comply with any regulations that the Marshals Service deems appropriate.[15] See 18 U.S.C. § 4013(b)(2). While the statute does permit the United States Marshals Service to establish certain guidelines that govern the receipt of federal funds, it does not deputize the employees of the private entity nor does it confer upon those employees the power to make arrests

for or to conduct investigations of those offenses listed in § 2516 of the Act.

To bolster their argument, Defendants cite a number of district court cases supporting the proposition that federal corrections officers are "[i]nvestigative or law enforcement officer[s]" for purposes of the Act. See, e.g., Crooker v. United States Dep't of Justice, 497 F.Supp. 500 (D.Conn.1980) (finding that corrections officers at the Federal Correctional Institution in Danbury, Connecticut, are within the § 2510(7) definition); United States v. Clark, 651 F.Supp. 76 (M.D.Pa.1986) (citing Crooker and making similar findings in the context of the Lewisburg Federal Penitentiary). These cases do not provide any useful guidance in this case.

Defendants in the instant matter are a private entity, and its Director. They are not federal corrections officers who might arguably be within the class of "any officer of the United States ... empowered by law to conduct investigations of or to make arrests for" the offenses in § 2516. There is simply no statute or case which bestows either of these powers upon Cornell or its employees. In fact, the statute that creates the United States Marshals Service, 28 U.S.C. § 561 (1994), provides that the Director of the Marshals Service has the power to appoint employees of the Marshals Service and to designate those employees as law enforcement officers.[16] Nothing in the record indicates that the Director of the Marshals Service has, in any way, designated Wyatt's employees to be law enforcement officers with the attendant power to arrest.

---

**14.** Cornell makes a similar argument with respect to its relationship with the city of Central Falls vis-à-vis the contract that it has entered with the CFDFC. Notwithstanding this contractual relationship, the Court has determined that Cornell's private employees are not included in the definition of "peace officer[s]" pursuant to R.I.Gen.Laws § 12–7–21. See supra Part III(B)(1).

**15.** The Code also provides a list of other criteria that a private entity must satisfy before it can receive federal funding. See 18 U.S.C. § 4013(b)(2)(A)–(D). Those criteria are not relevant for purposes of this discussion.

**16.** If Defendants were United States Marshals, it appears that they would fit within the § 2510(7) definition of "[i]nvestigative or law enforcement officer." United States Marshals are empowered to make warrantless arrests for any offense against the United States or for any felony that is "cognizable under the laws of the United States." See 28 U.S.C. § 566(d). United States Marshals are also empowered by federal law to exercise the same powers that a Rhode Island state sheriff might exercise. See 28 U.S.C. § 564; see also R.I.Gen.Laws § 12–7–21 (1994 Reenactment) (including the Rhode Island sheriff's department within the definition of "peace officer").

### c. North Carolina Law

■ Defendants also argue that they are investigative or law enforcement officers by virtue of their agreement to house North Carolina's prisoners at Wyatt. There is simply no merit to the claim that North Carolina could grant Wyatt's employees the legal authority to make arrests for or to conduct investigations of crimes that may have occurred within this state. *See, e.g., Stover v. O'Connell Assoc.,* 84 F.3d 132, 136 (4th Cir. 1996) ("A state's sovereign authority over persons, property, and activities extends only to its territorial limits, and its laws have no operation in other states except as allowed by those states or by comity."); *see also Maryland v. Barry,* 604 F.Supp. 495, 499 (D.D.C.1985) ("It appears that comity alone, and not constitutional compulsion, underlies the willingness of the several states to tolerate the presence of foreign law officers within their borders in the performance of their duties.") In the absence of indicia to the contrary, the Court will not assume that the General Assembly has accorded Wyatt's employees any special law enforcement powers as a result of the agreement between Cornell Cox and the State of North Carolina to house North Carolina's prisoners.[17]

### C. The Consent Exception

Having decided that Cornell's employees are not "[i]nvestigative or law enforcement officer[s]" for purposes of § 2510(5)(a)(ii), the Court turns to a discussion of 18 U.S.C. § 2511(2)(d) (Supp. II 1996), one of the Act's consent exceptions.[18]

Defendants claim that one of the Act's consent exceptions shields them from liability. This exception provides that:

It shall not be unlawful under this chapter for a person not acting under color of law to intercept a wire, oral, or electronic communication where such person is a party to the communication or where one of the parties to the communication has given prior consent to such interception unless such communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State.

18 U.S.C. § 2511(2)(d).

■ The United States Court of Appeals for the First Circuit has recognized that the implied consent of one party to a communication may provide a defense to a claim that a person has intercepted a communication in violation of the Act. *See United States v. Lanoue,* 71 F.3d 966, 981 (1st Cir. 1995) (noting that consent might properly be implied in the context of § 2511(2)(c) where an inmate received notice of the interception in accordance with the Federal Bureau of Prisons Regulations); *Campiti v. Walonis,* 611 F.2d 387, 393–94 (1st Cir.1979) (holding that consent not implied under § 2511(2)(c)). The appeals court has noted that implied consent is not constructive consent but rather " 'consent in fact.' " *See Lanoue,* 71 F.3d at 981 (quoting *Griggs–Ryan v. Smith,* 904 F.2d 112, 116–17 (1st Cir.1990)). Moreover, while consent should not be casually inferred, it may be implied in some circumstances notwithstanding insufficient notice. *See id.*

■ The parties' submissions on this issue lead the Court to conclude that there remains a "genuine issue" of "material fact" that must be resolved before a rational factfinder. Plaintiffs have produced competent evidence, including affidavits and deposition testimony, which indicates that Defendants may have been recording inmates' telephone conversations since Wyatt's inception in 1993. They have also adduced evidence, by way of affidavit and deposition testimony, that signs indicating that calls might be intercepted may not have been posted near the inmates' telephones at all times.

---

17. The record facts do not indicate that either Plaintiff Meade or Plaintiff Huguenin was detained at Wyatt pursuant to Cornell's agreement with the State of North Carolina.

18. Defendants make their argument citing 18 U.S.C. § 2511(2). In fact, that section of the statute is comprised of a number of subsections. Two of those subsections, § 2511(2)(c) and § 2511(2)(d), include consent exceptions. The former treats persons who act "under color of law," while the latter treats persons "not acting under color of law." For purposes of this discussion, the Court assumes that Defendants argue pursuant to § 2511(2)(d), and does not decide whether Cornell's employees acted "under color of law" for purposes of § 2511(2)(c).

Defendants have produced documentary evidence to support its contention that Wyatt provided the inmates with a handbook which informed them that their conversations might be recorded. There is also documentary evidence in the form of written policies to suggest that Defendants may have furnished a separate telephone that inmates could use to make privileged calls to their attorneys. One affidavit shows that Defendants may have briefed the inmates upon arrival as to the telephone monitoring policies at Wyatt.

Given these submissions, the Court concludes that the issue of implied consent turns on the sufficiency of the notice that Defendants may or may not have afforded the inmates prior to intercepting their communications. In terms of the summary judgment standard, the issue of implied consent is "genuine," and the fact of notice is "material." Because neither party has satisfied its burden under Fed.R.Civ.P. 56(c) with respect to this issue, the motions for summary judgment are denied.

### D. Federal Bureau of Prisons Regulations

Defendants have asserted that Plaintiffs Patrick Meade and Robert Huguenin have no standing to pursue their claims as they have failed to exhaust administrative remedies as required by the Federal Bureau of Prisons regulations. See 28 C.F.R. § 542.10 (1996). Without rendering a treatise on the subject, it is necessary to briefly address the Defendants' argument.

 The Bureau of Prisons regulations specifically list those institutions that fall under the direction and control of that agency. See, e.g., 28 C.F.R. § 503.2 (1996); see also Bureau of Prisons Central Office, Regional Offices, Institutions, and Staff Training Centers, 63 Fed.Reg. 55,774, 55,775–76 (1998) (to be codified at 28 C.F.R. pt. 503.2). Wyatt is not listed in this otherwise exhaustive list. While it may be true that Defendants have contracted with the CFDFC to follow all "Laws," including regulations, it is not true that the procedures set forth in the Federal Bureau of Prisons regulations bind Wyatt's

inmates.[19] The Federal Bureau of Prisons simply does not recognize Wyatt as one of the eighteen penal institutions that falls within its Northeast Region. Though Defendants' decision to follow certain provisions of the regulations might be relevant for purposes of proving notice and consent at trial, they carry no weight in assessing either Plaintiff Meade's or Plaintiff Huguenin's standing to pursue this action.

### IV. CONCLUSION

For the reasons stated herein, both Plaintiffs' and Defendants' motions for summary judgment are denied.

SO ORDERED.

---

19. Part 542.10, title 28 of the Code of Federal Regulations specifically provides that administrative remedies provided in the regulations "do[ ] not apply to inmates confined in other nonfederal facilities."